[No. G017070. Fourth Dist., Div. Three. Feb. 26, 1998.]

ERNEST BARRETT et al., Plaintiffs and Appellants, v.
ROBERT DAWSON et al., Defendants and Respondents.

**COUNSEL**

Nathan W. Tarr and Paul B. Witmer, Jr., for Plaintiffs and Appellants.

Kelegian & Thomas, Kelegian, Thomas & Tieger and Michael Paul Thomas for Defendants and Respondents.

Landels, Ripley & Diamond, Michael H. Zischke, Sanford Svetcov, Abby J. Cohen and Elissa S. Gershon as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**SILLS, P. J.**—In 1981 the California Legislature enacted a law which declared that restrictive covenants made *after* the effective date of the law (January 1, 1982), which limited family daycare homes in residential neighborhoods, were void. Then, in 1983, the Legislature amended the law

to delete the reference to covenants made after its effective date. Covenants restricting family daycare homes were now "void," period.

This case involves a restrictive covenant made prior to 1981 prohibiting a residence in Tustin from being used for any "business" activity, including a family daycare home. The neighbors want to enforce the covenant to close down a family daycare home now operating on the property.

We have determined that given the Legislature's 1983 change, it is obvious the Legislature intended the law to apply to restrictive covenants made at any time. Furthermore, such an application does not contravene the contract clause of either the federal or the state Constitutions. Accordingly, we affirm the judgment allowing the family daycare home to remain in operation.

*Health and Safety Code Section 1597.40, Subdivision (c) Applies to All Restrictive Covenants, Regardless of When Made*

The particular law in question is section 1597.40, subdivision (c) of the Health and Safety Code.[1] It was originally enacted as section 1597.501, subdivision (d) of the Health and Safety Code in 1981. (See Stats. 1981, ch. 1162, § 3, p. 4647.) When originally enacted in 1981, the text read: "Every restriction or prohibition *entered into on or after the effective date of this section*, whether by way of covenant, condition upon use or occupancy, or upon transfer of title to real property, which restricts or prohibits directly, or indirectly limits, the acquisition, use, or occupancy of such property for a family day care home for children is void." (Italics added.) The act adding new section 1597.501 to the code contained no emergency provision (see Stats. 1981, ch. 1162, p. 4645) and so became effective on January 1, 1982. (See Cal. Const., art. IV, § 8, subd. (c)(1); *People* v. *Jenkins* (1995) 35 Cal.App.4th 669, 673 [41 Cal.Rptr.2d 502] [" 'Under the California Constitution, a statute enacted at a regular session of the Legislature generally becomes effective on January 1 of the year following its enactment . . . .' "].)

In 1983, the Legislature amended and renumbered section 1597.501. The renumbered statute became section 1597.40. Subdivision (d) became, verbatim, new subdivision (c), except that the words *on or after the effective date of this section* were dropped. As the statute then read (and has read since),

---

[1]All statutory references are to the Health and Safety Code unless otherwise designated.

every restriction "entered into" which limits family daycare homes "is void."

About nine years later, in 1992, a group of members of the Bellewick Community Association in Tustin filed suit to close a family daycare center in their neighborhood. The daycare center is run by defendant Socorro Jones, a tenant of Robert and June Dawson, who are the owners of a single- family home in the neighborhood. The daycare center was licensed for up to 12 children at a time. Jones cares for the children from 7 a.m. to about 5:30 p.m. each day.[2]

The neighbors relied on a declaration of restrictions recorded when the neighborhood was developed in 1968, which provided that no lot in the tract "shall be used for the conduct of any trade, business, professional or commercial activity of any kind or nature whatsoever." After a court trial in 1994, a judgment was entered declaring that section 1597.40 applied to the case and, as applied, is constitutional. The neighbors then brought this appeal.

■ The effect of changes in statutes governing what are commonly called CC&R's (conditions, covenants and restrictions) has been addressed by our Supreme Court in *Nahrstedt* v. *Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361 [33 Cal.Rptr.2d 63, 878 P.2d 1275]. There, the high court noted that former section 1355 of the Civil Code required the developer of a condominium project, prior to selling any units, to record a " 'declaration of restrictions relating to such project, which restrictions shall be enforceable equitable servitudes *where reasonable*.' " (*Nahrstedt, supra,* 8 Cal.4th at p. 379, fn. 10, italics added, quoting former Civil Code section 1355.) Later, the Legislature changed the law, enacting Civil Code section 1354, subdivision (a), which provided that "[t]he covenants and restrictions in the declaration shall be enforceable equitable servitudes, *unless unreasonable*." (Italics added; see also *Nahrstedt, supra,* 8 Cal.4th at p. 378.)

The Supreme Court declared that the transition from *where reasonable* in the old law to *unless unreasonable* in the new was a "material alteration" intended to signal the Legislature's intent to give the enactment a new meaning. In particular the new *unless unreasonable* phrasing "cloaked" CC&R's with a presumption of reasonableness not existent in the old *where reasonable* statute.

---

[2]The neighbors also sought an injunction to prevent Jones from holding yard sales. They got it and that part of the judgment is not at issue in this appeal.

If the relatively subtle shift from "where reasonable" to "unless unreasonable" was a material change in the legislative language in *Nahrstedt*, how much more so is the deletion of the words *on or after the effective date of this section* here. It is well established that material changes in the phraseology of statutes normally demonstrate an intent by the lawmakers to change the meaning. (See *McDonough Power Equipment Co.* v. *Superior Court* (1972) 8 Cal.3d 527, 533-534, fn. 5 [105 Cal.Rptr. 330, 503 P.2d 1338].) Given such an intent, it is inescapable that the intent behind the deletion of the prospective-only language in 1983 was to render the statute *not* prospective. There really is no other reasonable explanation. (Cf. *Broadmoor San Clemente Homeowners Assn.* v. *Nelson* (1994) 25 Cal.App.4th 1, 4-6 [30 Cal.Rptr.2d 316] [holding that separate 1993 legislation making it unlawful to discriminate by means of restrictive covenants against homes for disabled invalidated prospective-only effect of language in another statute].) It makes no sense to suppose that the Legislature simply wanted to muddy what had previously been a clear statute.

Two additional reasons buttress our conclusion. First, the tense of the key words "entered into" literally points to *both* covenants *already* "entered into" as well as covenants which *will be* "entered into" in the future. (See *Overlook Farms* v. *Alternative Living* (1988) 143 Wis.2d 485 [422 N.W.2d 131, 134] [holding that language in statute declaring covenants " '*which expressly prohibit* use of property for community living arrangements *are void*' " was expressly retroactive because such restrictions currently prohibit favored living arrangement].) The natural inference is that the statute should apply to both categories.

Second, to hold that the amended statute did not provide for retroactive application would be contrary to its general purpose, as declared in section 1597.30: to remedy the "insufficient numbers of regulated family daycare homes in California." (§ 1597.30, subd. (b).) If the statute were not applied to CC&R's already "entered into" at the time it was passed, the number of residential areas affected by the statute would be essentially limited to new developments which sprang up after 1983. Such a limitation would not only vitiate the utility of the statute, but prevent family daycare homes from being established in many older subdivisions, again thwarting a clear legislative purpose. (See § 1597.30, subd. (d) ["Many parents prefer child day care located in their neighborhoods in family homes."]; cf. *Overlook Farms* v. *Alternative Living*, *supra*, 422 N.W.2d at p. 134 ["If the statute were not retroactive, group homes would be limited to those areas which are not currently restricted by covenant to single-family residences."].)

We therefore reject the neighbors' argument that the absence of express retroactivity language in the 1983 renumbering and reamendment is dispositive in light of the usual presumption that statutes operate prospectively

only. (E.g., *Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1207 [246 Cal.Rptr. 629, 753 P.2d 585].) We will not presume the Legislature engaged in a futile act: The deletion of the prospective-only language showed an intent to do *something*, and that something could only be to make the statute *not* prospective only.

*Application of Section 1597.40, Subdivision (c) to All Restrictive Covenants,*
*Regardless of When Made, Is Constitutional*

 The next question is whether the retroactive application is constitutional. We may dispense with the idea that such an application is a regulatory "taking" of the property. The simple answer here is that taking claims require state action. (*Bach* v. *County of Butte* (1989) 215 Cal.App.3d 294, 307 [263 Cal.Rptr. 565] [". . . it is elementary that an inverse condemnation action—being based upon the taking or damaging of property for public use without just compensation—requires state action and, therefore, cannot be asserted against private parties"].) While it is possible that the *enforcement* of CC&R's under certain circumstances might constitute sufficient state action to implicate the 14th Amendment to the United States Constitution (*Shelley* v. *Kraemer* (1948) 334 U.S. 1, 20 [68 S.Ct. 836, 845-846, 92 L.Ed. 1161, 3 A.L.R.2d 441]), the neighbors have not referred us to any authority for the counterintuitive proposition that the *absence* of the enforcement of a particular restrictive covenant against *another* owner's property amounts to a governmental expropriation of one's *own* property.

We need not get bogged down in the metaphysics of where property ends and contract rights begin to know that, in this case, the right of the neighbors to enforce a restrictive covenant limiting the use of *neighboring* property is clearly contractual. It is a right merely to limit the uses to which *someone else's property* is put. The neighbors' real argument is that the retroactive application of section 1597.40, subdivision (c) impairs a valuable contract right incident to their property. That brings us to the contracts clause of the federal and state Constitutions. (See U.S. Const., art. I, § 10; Cal. Const., art. I, § 9.)

 As the United States Supreme Court has interpreted the federal contracts clause, contracts clause questions turn on a three-step analysis. (See generally, *Energy Reserves Group* v. *Kansas Power & Light* (1983) 459 U.S. 400, 410-412 [103 S.Ct. 697, 703-705, 74 L.Ed.2d 569].) The first and threshold step is to ask whether there is any impairment at all, and, if there

is, how substantial it is. (*Id.* at p. 411 [103 S.Ct. at p. 704].) If there is no "substantial" impairment, that ends the inquiry. If there is substantial impairment, the court must next ask whether there is a "significant and legitimate public purpose" behind the state regulation at issue. (*Id.* at pp. 411-412 [103 S.Ct. at p. 704].) If the state regulation passes that test, the final inquiry is whether means by which the regulation acts are of a "character appropriate" to the public purpose identified in step two. (See *id.* at pp. 412, 418 [103 S.Ct. at pp. 704-705, 708] [characterizing third step as "means chosen" to "implement" legislative "purposes"].)

 Here, there is, to be sure, a substantial impairment of the neighbors' contract right to limit the uses of nearby property. (See *Nahrstedt* v. *Lakeside Village Condominium Assn., supra,* 8 Cal.4th 361, 383-384 [stressing importance of settled expectations in context of restrictive covenants governing condominium development].) But, while there is clearly an impairment of a contractual right, there is, just as clearly, a "significant and legitimate public purpose" behind the "state regulation" which voids the enforcement of the contract right. Indeed, ensuring adequate and local daycare for working parents is probably about as broad a public purpose as any that might be imagined in the regulatory universe. Section 1597.40, subdivision (c) is obviously not aimed at benefiting some narrow band of producers or economic interests,[3] but at anybody who has children in need of daycare, which is a very large segment of the population, including parents who happen to live in this particular tract in Tustin. And we need not elaborate on the general importance of local daycare to society as a whole.

We now come to the third step—appropriate means. The statute is tailored to the promotion of *family* daycare homes appropriate to lots zoned for single-family dwelling (see § 1597.46), not commercial kindergartens. The *largest* family daycare homes allowed under California's scheme are for 12 children. (See § 1596.78.)

---

[3]In *Clem* v. *Christole, Inc.* (Ind. 1991) 582 N.E.2d 780, 784, the Indiana Supreme Court held that a statute invalidating restrictive covenants preventing homes for the developmentally disabled in residential neighborhoods contravened the contract clause in the Indiana State Constitution because, among other things, it did not "address a broad problem general to society," thus illustrating the importance of the relative breadth or narrowness of the constituency served by the impairment. (But cf. *Broadmoor San Clemente Homeowners Assn.* v. *Nelson, supra,* 25 Cal.App.4th 1, 7-9 [California statute invalidating restrictive covenants preventing homes for elderly disabled in residential neighborhoods was intended to bring state into conformity with federal policy on discrimination against disabled]; *Crane Neck Ass'n* v. *N.Y. City/Long Island Cty.* (1984) 61 N.Y.2d 154 [472 N.Y.S.2d 901, 460 N.E.2d 1336, 1339-1340, 41 A.L.R.4th 1204] [stressing long-standing importance of New York State policy to deinstitutionalize mentally and developmentally retarded individuals].)

It can, of course, be argued that the statute might have been *better* tailored to its purpose had it limited itself to what is defined as small family daycare homes, i.e., limited to six or fewer children (§ 1596.78, subd. (b)), rather than including large family daycare homes, which may provide daycare up to twelve children. (See § 1596.78, subd. (a).) No doubt the impact of the traffic bringing up to 12 children into a residential neighborhood at rush hour is perceptibly worse than it would be for 6. But a 12-children limit is not so unreasonably excessive in relation to the purpose of encouraging the establishment of family daycare homes in the first place that it fails the appropriate means test. In fact, the Legislature has already taken into account the additional external effects associated with large family daycare homes. Section 1597.46, subdivision (a)(2) specifically authorizes local governments to prescribe "reasonable standards, restrictions and requirements concerning spacing and concentration, traffic control, parking and noise control," albeit noise standards must "take into consideration the noise level generated by children." (§ 1597.46, subd. (a)(3).)

Under the methodology of *Energy Reserves*, we can therefore say that the retroactive application of section 1597.40 passes muster under the federal contracts clause. What about the state contracts clause?

The neighbors have not argued that the state contracts clause requires a different analysis than the federal one, and we therefore do not gratuitously explore the issue. For the moment it is enough to note that in one of the most important cases concerning the state contracts clause in recent memory, *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] [addressing a variety of challenges to Proposition 103's regulation of insurers], the California Supreme Court did not differentiate between the federal and state clauses in its analysis and, further, drew primarily from recent United States Supreme Court cases (including *Energy Reserves*), as well as a number of out-of-state cases. (See *Calfarm, supra*, 48 Cal.3d at pp. 826-831.)

*Seaton* v. *Clifford* (1972) 24 Cal.App.3d 46 [100 Cal.Rptr. 779], relied on by the neighbors, is inapposite to the contracts clause issue. There the court held that the *enforcement* of certain restrictive covenants against a facility for mentally retarded or otherwise handicapped persons did not, by itself, contravene public policy or unconstitutionally discriminate against any group of persons. The court had no occasion to deliberate on the effect of a state law which *precluded enforcement* of a restrictive covenant.

## DISPOSITION

The judgment is affirmed. Respondents are to recover costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.