102 Cal.Rptr.2d 1 (2000)
84 Cal.App.4th 819
VILLA MILANO HOMEOWNERS ASSOCIATION, Plaintiff and Respondent,
v.
IL DAVORGE, Defendant and Appellant.
No. G023526.
Court of Appeal, Fourth District, Division Three.
November 6, 2000.
As Modified on Denial of Rehearing November 27, 2000.
Review Denied February 21, 2001.
*2 Cooksey, Howard, Martin & Toolen, Thomas F. Zimmerman, Costa Mesa, and Wilson E. Yurek for Defendant and Appellant.
Duke, Gerstel, Shearer, and Dawn R. Brennan, San Diego, for Plaintiff and Respondent.

OPINION
SILLS, P.J.
In this case of first impression, we decide whether a developer can use a declaration of covenants, conditions and restrictions (CC & R's) containing a binding arbitration clause as a device to preclude homeowners, and the homeowners association of which they are members, from pursuing an action for construction or design defect damages in a court of law. When homeowners purchase property subject to CC & R's, they agree to be bound by those CC & R's, including any arbitration clause contained therein. But that agreement, like any other, will not be enforced if it is unconscionable. Code of *3 Civil Procedure section 1298.7 provides home buyers the right to bring a judicial action for construction or design defect damages even when the purchase agreement contains a binding arbitration clause. Public policy will not permit a developer, who is unable to use a purchase agreement to block a home buyer's access to a judicial forum, to cut off that access by circuitous meansthe CC & R's.

I

FACTS
II Davorge, a California limited partnership, was the developer of the Villa Milano condominium complex located in Huntington Beach. In order to create a "condominium project" governed by the Davis Stirling Common Interest Development Act (Civ.Code, § 1350 et seq.), it recorded CC & R's governing the use and maintenance of the property within the complex (Civ. Code, §§ 1351-1353). As the sole owner of the property at the time of recordation, II Davorge was the only party to sign the CC & R's. More than two years after the CC & R's were recorded, and before any units were sold, II Davorge lost the project through foreclosure by its construction lender. The units were sold thereafter.
The CC & R's provided for the creation of the Villa Milano Homeowners Association (Association), a nonprofit corporation. Every owner of a condominium unit is a member of the Association, as required by the CC & R's. The Association is governed by applicable statutes, its articles of incorporation, its bylaws, and most notably, the CC & R's. (2 Hanna & Van Atta, Cal. Common Interest Developments: Law and Practice (1999) § 18:40, p. 46 (hereafter Hanna & Van Atta).) The CC & R's, by their terms, are imposed as equitable servitudes against the property and bind all owners of interests in the property, both the individual unit owners and the Association as the holder of an easement interest in the common area.
Eventually, the homeowners and the Association discovered that both the individual units and the common area suffered from what they believed to be various construction and design defects. Hence, the Association filed a complaint against II Davorge seeking compensation for damages to the project. While the Association filed the suit in its own name, pursuant to Code of Civil Procedure section 383,[1] it sought recovery for damages suffered by the individual unit owners as to their separate interests in the project. In this way, it represented the interests of the individual homeowners.
II Davorge filed a petition to compel arbitration (Code Civ.Proc., § 1281.2), based on an arbitration clause contained in the CC & R's. That clause provides that any dispute between II Davorge on the one hand, and either a unit owner or the Association on the other hand, will be submitted to binding arbitration.[2] Controversies *4 concerning the construction or design of the project are specifically identified as being subject to arbitration. The trial court denied the petition, likening the arbitration clause to an adhesion contract and calling it "un-American."[3] II Davorge appealed. (Code Civ.Proc., § 1294, subd. (a).) We affirm.

II

CONTRACT LAW

A. Agreement to Arbitrate

In its petition to compel arbitration, II Davorge contended that a written agreement to arbitrate, between II Davorge and the Association, was memorialized in the CC & R's. A written agreement to arbitrate is fundamental, because Code of Civil Procedure section 1281.2 permits a court to order the parties to arbitrate a matter only if it determines that an agreement to arbitrate exists. (Banner Entertainment, Inc. v. Superior Court (1998) 62 Cal.App.4th 348, 356, 72 Cal.Rptr.2d 598; Berman v. Renart Sportswear Corp. (1963) 222 Cal.App.2d 385, 388-389, 35 Cal.Rptr. 218.) Indeed, when the trial court reviews a petition to compel arbitration, the threshold question is whether there is an agreement to arbitrate. (Cheng-Canindin v. Renaissance Hotel Associates (1996) 50 Cal.App.4th 676, 683, 57 Cal.Rptr.2d 867.)
The Association claims there is no agreement to arbitrate, relying on Badie v. Bank of America (1998) 67 Cal.App.4th 779, 79 Cal.Rptr.2d 273. In Badie, a bank attempted to unilaterally impose an arbitration provision on its customers by sending them bill stuffers notifying them of a change in terms. The bank asserted it had the right to add the arbitration provision to the customer agreements because it had retained the right to unilaterally change the terms of those agreements. The court struck down the arbitration clause, having determined that the original customer agreements did not contemplate the addition of any new terms of that nature. (Id. at p. 803, 79 Cal.Rptr.2d 273.)
However, Badie is distinguishable for a couple of reasons. First, by use of the bill stuffers, the bank in Badie sought to change the terms to which the customers had already agreed. But here, there is no change in terms. Rather, the arbitration clause has been a part of the CC & R's since the date of recordation. Second, Badie did not have to do with condominium units and recorded CC & R's at all. As to those, a separate body of law applies.
Individual condominium unit owners "are deemed to intend and agree to be bound by" the written and recorded CC & R's, inasmuch as they have constructive notice of the CC & R's when they purchase their homes. (Citizens for Covenant Compliance v. Anderson (1995) 12 Cal.4th 345, 349, 47 Cal.Rptr.2d 898, 906 P.2d 1314.) CC & R's have thus been construed as contracts in various circumstances. (See, e.g., Frances T. v. Village Green Owners Assn. (1986) 42 Cal.3d 490, 512-513, 229 Cal.Rptr. 456, 723 P.2d 573 [CC & R's as contract between homeowner and homeowners association with respect to installation of common area lighting]; Barrett v. Dawson (1998) 61 Cal.App.4th 1048, 1054, 71 Cal.Rptr.2d 899 [CC & R's as contract between neighboring property owners prohibiting use of residential property for business activities]; and Franklin v. Marie Antoinette Condominium Owners Assn. (1993) 19 Cal.App.4th 824, 828, *5 833-834, 23 Cal.Rptr.2d 744 [CC & R's as contract between homeowner and homeowners association with respect to homeowners association's obligation to maintain and repair common area plumbing].)[4] The arbitration clause, as a provision of the Villa Milano CC & R's, is therefore a part of the contract between the parties. This, then, answers the threshold question: There is an agreement to arbitrate.

B. Enforceability

This is only the beginning of our inquiry, however. The trial court concluded the CC & R's were an adhesion contract and the arbitration provision was unenforceable because it was unconscionable. Faced with that determination, II Davorge argues the CC & R's very simply are not a contract at all, so contract law concerning enforceability is irrelevant.[5] More specifically, II Davorge contends CC & R's are equitable servitudes and the court should have applied real property law instead of contract law. As we stated in Barrett v. Dawson, supra, 61 Cal.App.4th at p. 1054, 71 Cal.Rptr.2d 899, "We need not get bogged down in the metaphysics of where property ends and contract rights begin to know that, [in some contexts], the right . . . to enforce a restrictive covenant [in CC & R's] is clearly contractual." This is one of those contexts. The right to enforce the covenant to arbitrate must necessarily be contractual in this case. Unless a valid agreement to arbitrate exists, as determined under contract law, the petition to compel arbitration must be denied. (Banner Entertainment, Inc. v. Superior Court, supra, 62 Cal.App.4th at pp. 356-357, 72 Cal.Rptr.2d 598; Cheng-Canindin v. Renaissance Hotel Associates, supra, 50 Cal. App.4th at p. 683, 57 Cal.Rptr.2d 867.)
Clearly then, the enforceability of the contractual arbitration clause must be addressed. The only argument II Davorge makes relating to this point is that even if the CC & R's did constitute a contract, they could not be characterized as an adhesion contract, because the homeowners could have purchased property elsewhere in a condominium development whose governing CC & R's did not contain an arbitration clause. However, II Davorge provides no citation of authority in support of the proposition that a contract can never be adhesive if the weaker party could have rejected the agreement and gone elsewhere.
In Madden v. Kaiser Foundation Hospitals (1976) 17 Cal.3d 699, 711, 131 Cal. Rptr. 882, 552 P.2d 1178, our Supreme Court stated: "In the characteristic adhesion contract case, the stronger party drafts the contract, and the weaker has no opportunity . . . to negotiate concerning its terms. [Citations.]" It added: "In many cases of adhesion contracts, the weaker party lacks not only the opportunity to bargain but also any realistic opportunity to look elsewhere for a more favorable contract; he must either adhere to the standardized agreement or forego the needed service. [Citation.]" (Ibid., italics added.) In other words, the court left open the possibility that, in a given case, a contract might be adhesive even if the weaker party could reject the terms and go elsewhere. (See Jones v. Crown Life Ins. Co. (1978) 86 Cal.App.3d 630, 637, 150 Cal.Rptr. 375.)
*6 As our Supreme Court stated more recently in Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 113, 99 Cal.Rptr.2d 745, 6 P.3d 669,[6] an adhesion contract "`relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' [Citation.]" In evaluating whether a mandatory employment arbitration agreement was adhesive, the court concluded that there was "little dispute that it [was]. It was imposed on employees as a condition of employment and there was no opportunity to negotiate." (Id. at pp. 114-115, 99 Cal.Rptr.2d 745, 6 P.3d 669.) The prospective employees had to either sign the arbitration agreement or decline employment. Similarly, the United States District Court for the Central District of California, subsequent to Armendariz, held that certain promissory notes were adhesion contracts "because they [were] form contracts imposed by the party with superior bargaining power and [the borrowers] could not negotiate terms, but could only `take them or leave them.'" (Gray v. Conseco, Inc. (C.D.Cal., Sept. 29, 2000, No. SACV00-322DOC(EEX) 2000 WL 1480273, p. *4.))
Like the employees in Armendariz and the borrowers in Gray, the purchasers of units at the Villa Milano condominium complex faced a "take it or leave it" proposition: They either purchased subject to the CC & R's, or they did not purchase at all. As prospective home buyers, they had no opportunity to negotiate the provisions of the recorded CC & R's at the time of purchase. Yet a major distinction between the typical adhesion contract and CC & R's is that, once the homeowners have made their purchases, they ordinarily have the collective power to amend the CC & R's to suit their changing needs. (Civ. Code, § 1355.) This is because the CC & R's, unlike most contracts, establish a system of governance. (See Chantiles v. Lake Forest II Master Homeowners Assn. (1995) 37 Cal.App.4th 914, 922, 45 Cal. Rptr.2d 1.) In the case before us, the Villa Milano CC & R's specifically provide that they are amendable, pursuant to section 13.2 thereof. However, as II Davorge maintains, section 16.6 of the CC & R's limits that amendment right, and provides that the arbitration provision cannot be amended without the consent of the developer, even when the developer no longer owns property in the complex. With respect to the arbitration provision in question, then, it truly is a "take it or leave it" proposition, with no opportunity for subsequent amendment at the sole discretion of the homeowners.
This notwithstanding, whether the arbitration clause contained in the CC & R's is characterized as an adhesion contract or not, the question of the enforceability of the clause remains, for even an adhesion contract may be enforceable. (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4th at p. 113, 99 Cal.Rptr.2d 745, 6 P.3d 669; Graham v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807, 819-820, 171 Cal.Rptr. 604, 623 P.2d 165.) But no contract, whether adhesive or otherwise, will be enforced if it is unconscionable. (Graham v. Scissor-Tail, Inc., supra, 28 Cal.3d at p. 820, 171 Cal.Rptr. 604, 623 P.2d 165.)

C. Unconscionability

1. Procedural unconscionability

In determining whether an arbitration clause is unconscionable, courts generally apply a two-prong test. (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4th at p. 114, 99 Cal. Rptr.2d 745, 6 P.3d 669; U Hour Fitness, Inc. v. Superior Court (1998) 66 Cal. App.4th 1199, 1212-1213, 78 Cal.Rptr.2d 533.) They determine whether the clause is *7 procedurally unconscionable and whether it is substantively unconscionable. (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4th at p. 114, 99 Cal.Rptr.2d 745, 6 P.3d 669.) Both procedural and substantive unconscionability must be present for a contract to be unenforceable. (Ibid.) `"Procedural unconscionability' concerns the manner in which the contract was negotiated and the circumstances of the parties at that time. [Citation.] It focuses on factors of oppression and surprise. [Citation.] The oppression component arises from an inequality of bargaining power of the parties to the contract and an absence of real negotiation or a meaningful choice on the part of the weaker party. [Citations.]" (Kinney v. United HealthCare Services, Inc. (1999) 70 Cal.App.4th 1322, 1329, 83 Cal.Rptr.2d 348.) The surprise component comes into play when "the terms to which the party supposedly agreed [are] hidden in a prolix printed form drafted by the party seeking to enforce them. [Citations.]" (Id. at pp. 1329-1330, 83 Cal.Rptr.2d 348.)
The procedural unconscionability in this case is obvious. The Villa Milano CC & R's were drafted in toto by the developer and recorded years before the purchasers ever came to buy. There was no possibility that individual buyers could negotiate CC & R's amendments applicable only to their own properties. Rather, it was an all or nothing proposition. Each and every buyer took subject to the same set of CC & R's, or made no purchase at the development at all. There being absolutely no opportunity to negotiate, there was no meaningful choice, or for that matter any choice, as to the terms of the CC & R's.[7]
As for the surprise component, the CC & R's are 70 pages long and the arbitration clause appears on pages 67 to 68. The arbitration clause was decidedly well buried in a heap of paper. To top it off, at the same time that the purchasers received copies of the CC & R's they most likely received a thick stack of additional documentscopies of the Association's bylaws and articles of incorporation, in addition to the purchase agreement and the escrow instructions. In short, it is unlikely the arbitration clause popped right out to the purchasers' attention so they became immediately aware that by purchasing a home subject to the CC & R's they were agreeing to the binding arbitration of disputes with the developer.

2. Substantive unconscionability

The second element of unconscionabilitythe substantive elementis present here as well. "While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to `shock the conscience,' or that impose harsh or oppressive terms. [Citation.]" (24 Hour Fitness, Inc. v. Superior Court, supra, 66 Cal.App.4th at p. 1213, 78 Cal.Rptr.2d 533.) Here, the homeowners, by agreeing to CC & R's that include a binding arbitration clause, waive their constitutional right to a jury trial. (Cal.Const., art. I, § 16.) While this they certainly may do (Lagatree v. Luce, Forward, Hamilton & Scripps (1999) 74 Cal.App.4th 1105, 1116-1117, 88 Cal.Rptr.2d 664), "the right to pursue claims in a judicial forum is a substantial right and one not lightly to be deemed waived. [Citations.]" (Marsch v. Williams (1994) 23 Cal.App.4th 250, 254, 28 Cal. Rptr.2d 398.) In this case, the homeowners' waivers are obtained by way of a stealthy device of the developer that is prohibited by public policy.
Public policy is enunciated in constitutional or statutory provisions, and sometimes in administrative regulations that serve statutory objectives. (Green v. Ralee Engineering Co. (1998) 19 Cal.4th 66, 71, *8 80, 78 Cal.Rptr.2d 16, 960 P.2d 1046.) Here, both statutory (Code Civ.Proc., §§ 1298-1298.8; Civ.Code, § 1375) and regulatory (Cal.Code Regs., tit. 10, § 2791.8) provisions bear upon the applicable public policy.
Code of Civil Procedure sections 1298 through 1298.8 are of most particular concern. In these provisions, the Legislature has addressed the form, content, and effect of arbitration clauses contained in real property sales documentation. Specifically, Code of Civil Procedure section 1298 requires arbitration provisions contained in contracts to convey real property, including marketing contracts, deposit receipts, real property sales contracts, leases coupled with options to purchase, and ground leases coupled with improvements, to meet certain requirements. An arbitration clause must be clearly titled "ARBITRATION OF DISPUTES," meet certain print size and capitalization requirements, and contain a prominent notice provision as set forth in section 1298. (Code Civ.Proc., § 1298, subds. (a) & (c).) The notice provision must be initialed by the parties if they agree to arbitration. (Code Civ.Proc., § 1298, subd. (c).)
The obvious intent of these requirements is to call to the buyer's attention the fact that he or she is being requested to agree to binding arbitration and to make certain that he or she does so voluntarily, if at all. By placing the arbitration provision in the CC & R's, which contain no notice provision and are not signed by the buyer, the developer avoids informing the buyer that he or she is waiving the right to a jury trial. We can hardly condone this mechanism for circumventing the protections of a statute.
Even more compelling to the analysis is Code of Civil Procedure section 1298.7, which provides that even when an arbitration provision is included in an agreement to convey real property, "it shall not preclude or limit any right of action to which [Code of Civil Procedure] Section 337.1 or 337.15 is applicable."[8] Code of Civil Procedure sections 337.1 and 337.15 pertain to litigation to recover damages for construction and design defects. In other words, the net effect of section 1298.7 is to permit a purchaser to pursue a construction and design defect action against the developer in court, even if the purchaser signed an agreement to convey real property containing an arbitration clause.[9] (Knight et al., Cal.Practice Guide: Alternative Dispute Resolution (The Rutter Group 1999) ¶ 5:106, p. 5-46.)
II Davorge recorded the Villa Milano CC & R's in 1992, more than three years after the July 1, 1989 effective date of Code of Civil Procedure section 1298.7. (Code Civ. Proc, § 1298.8.) It maintains that doing so was perfectly appropriate, because CC & R's are not among the enumerated types of real property sales documentation to which section 1298.7 applies. (Code Civ. Proc, §§ 1298, 1298.7.) It appears II Davorge sought to accomplish by way of the CC & R's that which section 1298.7 blocked it from doing via a purchase agreement. It intended to bar the individual unit owners from filing construction or design defect actions against it in court. This flies in the face of the obvious legislative intent to permit home buyers to have their construction and design defects claims heard in a judicial forum. It is a blatant attempt to curtail the statutory rights of the home buyers and simply shocks the conscience.
*9 In addition, while Code of Civil Procedure section 1298.7 does not address homeowners associations directly, it would be absurd to construe the provision as permitting individual home buyers to pursue their construction and design defect claims in court only when they file the actions themselves and not when the claims are brought by the homeowners association on their behalves, as authorized by Code of Civil Procedure section 383. This would place an unfounded limitation on the right to judicial access as provided by Code of Civil Procedure section 1298.7. We must construe a "statute in a reasonable and commonsense manner consistent with the legislative intent. [Citation.]" (C & C Partners, Ltd. v. Department of Industrial Relations (1999) 70 Cal.App.4th 603, 608, 82 Cal.Rptr.2d 783.) The interpretation must be practical, resulting in "`"wise policy rather than mischief or absurdity. . . ."' [Citation.]" (Ibid.)
Furthermore, the Legislature has not overlooked the issue of whether homeowners associations should be compelled to engage in the binding arbitration of construction and design defect disputes. Civil Code section 1375 [10] establishes a set of pre-litigation procedures to be followed before a homeowners association may file suit against a builder for construction or design defects. (Civ.Code, § 1375, subd. (a).) Those procedures require a homeowners association and a builder to either "attempt to settle the dispute or attempt to agree to submit it to alternative dispute resolution." (Civ.Code, § 1375, subd. (b)(2).) But if the attempts are unsuccessful, section 1375 permits the association to file a judicial action against the developer. (Civ.Code, § 1375, subds.(a), (g) & (h).) The provision demonstrates that the Legislature has chosen to encourage alternative dispute resolution between homeowners associations and developers, but not to require it. In the end, a homeowners association has access to the courts.
In construing public policy with respect to arbitration clauses, our final consideration is the effect of California Code of Regulations, title 10, section 2791.8,[11] governing the contents of arbitration clauses contained in CC & R's. The Department of Real Estate (DRE) adopted the regulation pursuant to Business and Professions Code section 11001. That section permits the adoption of regulations as reasonably necessary for the enforcement of the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.). "The purpose of the Subdivided Lands Act `is to protect individual members of the public who purchase lots or homes from subdividers and to make sure that full information will be given to all purchasers concerning . . . essential facts with reference to the land.' [Citation.] The law seeks to prevent fraud and sharp practices in a type of real estate transaction which is peculiarly open to such abuses. [Citation.]" (Manning v. Fox (1984) 151 Cal.App.3d 531, 541-542, 198 Cal.Rptr. 558.) In furtherance of this purpose, a subdivider is required to obtain a DRE-issued public report concerning a development before it may commence sales. (Bus. & Prof.Code, § 11018.2.) As part of the public report application and review process, the subdivider must submit to the DRE copies of documentation it proposes to use in connection with the subdivision, such as the articles of incorporation and bylaws of the homeowners association, and *10 the CC & R's. (Bus. & Prof.Code, §§ 11010, 11018.5, subd. (c).)
Via California Code of Regulations, title 10, section 2791.8, the DRE has informed public report applicants that if they submit CC & R's that contain arbitration clauses, those arbitration clauses must include certain provisions[12] in order to receive DRE approval. Consistent with the purpose of the Subdivided Lands Act to protect home buyers, the regulation evidences an intent to ensure that arbitration provisions, if contained in CC & R's, be fair. It does not require that CC & R's contain arbitration provisions and it certainly is not a proclamation that binding arbitration is the favored method for resolving construction and design defect disputes between the subdivider and the home buyer.[13] With respect to the resolution of that narrow category of disputes, the Legislature has spoken. (Code Civ.Proc., § 1298.7.) Moreover, the fact that the DRE permits subdividers to utilize CC & R's containing certain types of arbitration clauses does not mean those clauses are necessarily binding in every conceivable context.
Our review of the applicable statutory and regulatory provisions convinces us public policy disfavors the binding arbitration clause in the context of the case before us. With respect to construction and design defect claims, the clause is substantively unconscionable as an attempt to evade the statutory protections of Code of Civil Procedure sections 1298 through 1298.8. While Civil Code section 1375 does not address situations in which the parties have signed an arbitration clause already, it demonstrates that, at least in other contexts, arbitration of construction and design defects is encouraged but not mandatory. Finally, California Code of Regulations, title 10, section 2791.8, merely indicates that arbitration clauses must be fair and meet certain minimum criteria in order to receive DRE approval.

III

REAL PROPERTY LAW
Even though the enforceability of the arbitration agreement is a matter of contract law (Banner Entertainment, Inc. v. Superior Court, supra, 62 Cal.App.4th at pp. 356-357, 72 Cal.Rptr.2d 598; Code Civ.Proc., § 1281), we will address II Davorge's real property arguments. II Davorge contends Civil Code section 1354, subdivision (a), should be applied to enforce the arbitration provision against the Association as an equitable servitude. However, even if that statutory provision were applied, the result would be the same.
Civil Code section 1354, subdivision (a), provides as follows: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the *11 benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both."[14] As II Davorge points out, restrictions in recorded CC & R's are presumed reasonable and the burden is on the party challenging a given restriction to prove otherwise. (Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 380, 33 Cal.Rptr.2d 63, 878 P.2d 1275.) In order to do so, that party must show the restriction "violates public policy; . . . bears no rational relationship to the protection, preservation, operation or purpose of the affected land; or . . . otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (Id. at p. 382, 33 Cal.Rptr.2d 63, 878 P.2d 1275.) In this case, the Association met its burden by showing that the arbitration provision violates public policy.
II Davorge disagrees, reminding us that public policy generally favors arbitration. (Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4th at p. 97, 99 Cal.Rptr.2d 745, 6 P.3d 669.) But in this case, a more specific public policy controls. Public policy concerning the arbitration of home buyer construction and design defect claims is established by Code of Civil Procedure sections 1298 through 1298.8, as discussed above. Arbitration clauses, while generally favored, are against public policy when hidden by a developer in that prolix form called CC & R's, in a deliberate attempt to circumvent statutory protections for home buyers with construction and design defect claims.
In addition to public policy as established by Code of Civil Procedure sections 1298 through 1298.8, Civil Code section 1354 itself sheds light on public policy with respect to the enforcement of CC & R's. Civil Code section 1354, subdivision (b), provides that before either a homeowners association or a homeowner in a common interest development files a civil action "solely for declaratory relief or injunctive relief, or for declaratory relief or injunctive relief in conjunction with a claim for monetary damages . . . not in excess of five thousand dollars ($5,000), related to the enforcement of the governing documents, the parties shall endeavor . . . to submit their dispute to a form of alternative dispute resolution such as mediation or arbitration. . . ." Section 1354, subdivision (b), also gives each party the right to reject a proposal for alternative dispute resolution, and once that has been done, subdivision (c) provides the manner in which the parties proceed in court.
Clearly, the Legislature has contemplated alternative dispute resolution with respect to the enforcement of CC & R's as equitable servitudes and has chosen to encourage alternative dispute resolution only with respect to certain limited kinds of disputes, i.e., those seeking declaratory relief, injunctive relief, or either declaratory or injunctive relief in combination with a damages claim not to exceed $5,000. Even as to those categories of disputes, alternative dispute resolution is not mandatory. Perhaps most significant in the context before us is the fact that the Legislature has not seen fit to even encourage alternative dispute resolution with respect to CC & R's disputes involving claims in excess of $5,000. Civil Code section 1354 itself, then, does not lend support to II Davorge's assertion that mandatory arbitration is favored in this situation.

IV

CONCLUSION
The applicable provision of the Villa Milano CC & R's constitutes a written agreement to arbitrate within the meaning of Code of Civil Procedure section 1281.2. However, that agreement to arbitrate is unconscionable and therefore unenforceable (Civ.Code, § 1670.5, subd. (a)) to the extent it applies to construction and design *12 defect claims. We do not address whether an arbitration provision contained in CC & R's would be unconscionable were a different type of claim at issuefor example a dispute over a homeowners association's right to control the kind of improvements made to a home or a disagreement about whether a homeowners association could compel a homeowner to remove a boat from his or her driveway. Whether the application of an arbitration clause would be substantively unconscionable in such other circumstances is not before us. However, it is easy to conceive of many contexts in which an arbitration clause in CC & R's would not circumvent statutory protections, violate public policy, or otherwise pose issues of substantive unconscionability. In fact, we observe that Civil Code section 1354, subdivisions (b) through (d), encourages alternative dispute resolution with respect to certain disputes related to the enforcement of CC & R's.
Our holding is very narrow. It speaks only to the enforcement of a CC & R's provision compelling binding arbitration of construction and design defects claims against the developer who drafted, signed and recorded the CC & R's. It is not intended to cast doubt upon the enforceability of CC & R's in general. To the contrary, CC & R's "should be enforced unless they are wholly arbitrary, violate a fundamental public policy, or impose a burden on the use of affected land that far outweighs any benefit." (Nahrstedt v. Lakeside Village Condominium Assn., supra, 8 Cal.4th at p. 382, 33 Cal.Rptr.2d 63, 878 P.2d 1275.) Moreover, "recorded CC & R's are the primary means of achieving the stability and predictability so essential to the success of a [common interest] development." (Ibid.) The presumption of validity afforded to recorded CC & R's "provides substantial assurance to prospective condominium purchasers that they may rely with confidence on the promises embodied in the . . . CC & R's." (Id. at p. 383, 33 Cal.Rptr.2d 63, 878 P.2d 1275.)
CC & R's are beneficial forms of governance and the homeowners associations that enforce them provide valuable services. Indeed, the homeowners associations function almost "as a second municipal government, regulating many aspects of [the homeowners'] daily lives." (Chantiles v. Lake Forest II Master Homeowners Assn., supra, 37 Cal.App.4th at p. 922, 45 Cal.Rptr.2d 1; accord, Duffey v. Superior Court (1992) 3 Cal.App.4th 425, 434, 4 Cal.Rptr.2d 334.) "`"[U]pon analysis of the association's functions, one clearly sees the association as a quasi-government entity paralleling in almost every case the powers, duties, and responsibilities of a municipal government. As a `mini-government,' the association provides to its members, in almost every case, utility services, road maintenance, street and common area lighting, and refuse removal. In many cases, it also provides security services and various forms of communication within the community. There is, moreover, a clear analogy to the municipal police and public safety functions. . . ."' [Citation.]" (Chantiles v. Lake Forest II Master Homeowners Assn., supra, 37 Cal.App.4th at p. 922, 45 Cal.Rptr.2d 1.) In short, homeowners associations, via their enforcement of the CC & R's, provide many beneficial and desirable services that permit a common interest development to flourish.
This notwithstanding, not all CC & R's provisions will be enforced. CC & R's may not be used to unwittingly strip a homeowner of his or her right to have a construction or design defect claim heard in a judicial forum. Public policy dictates otherwise.

V

DISPOSITION
The order is affirmed. The Association shall recover its costs on appeal.
RYLAARSDAM, J., and BEDSWORTH, J., concur.
NOTES
[1] Code of Civil Procedure section 383, subdivision (a), provides: "An association established to manage a common interest development shall have standing to institute, defend, settle, or intervene in litigation, arbitration, mediation, or administrative proceedings in its own name as the real party in interest and without joining with it the individual owners of the common interest development, in matters pertaining to the following: [¶] . . . [¶] (2) Damage to the common areas[;] [¶] (3) Damage to the separate interests which the association is obligated to maintain or repair[; and] [¶] (4) Damage to the separate interests which arises out of, or is integrally related to, damage to the common areas or separate interests that the association is obligated to maintain or repair."
[2] Section 16.1 of the Villa Milano CC & R's provides in pertinent part as follows: "In the event of an arbitrable dispute between or among Declarant, its builder, general contractor or broker, or their agents or employees, on the one hand, and any Owner(s) or the Association, on the other hand, the matter will be submitted to binding arbitration. Arbitrable disputes include any controversy or claim between the parties, including any claim based on contract, tort, or statute, arising out of or relating to the rights or duties of the parties under this Declaration or other Project documents or the design or construction of the Project. . . ."
[3] As the trial court aptly stated: "[I]t's a sad commentary on the American justice system that we are farming everything out of the courts through A.D.R., through arbitration clauses and, . . . if this is a matter of freedom of choice rather than scarce resources [then] fine." "[But] [t]his certainly is a contract of adhesion. [When] [s]omebody buys a house, they certainly don't expect that buried . . . on page 66 of the CC & R's [is] an innocuous little provision: `If you have a problem with the developer, by the way, you don't get your right to a trial. You have to go to arbitration.'"
[4] While a homeowner is deemed to agree to abide by the recorded CC & R's because he or she has constructive notice of them before he or she purchases the home, we observe that the cited cases do not provide an analytical framework for addressing the issue why the homeowners association, which makes no purchase, is also bound contractually. However, neither the Association nor II Davorge raises the point, so we need not address it at length. Suffice it to say that the Association here is representing the collective interests of the homeowners, per Code of Civil Procedure section 383. The individual unit owners cannot be permitted to use the Association as a shell to avoid the application of the arbitration clause.
[5] Conversely, in its petition to compel arbitration, II Davorge argued the CC & R's constituted a written agreement.
[6] After the opinion in Armendariz v. Foundation Health Psychcare Services, Inc., supra, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669 was published, this court invited the parties to file supplemental briefing concerning the significance of the case and the parties did file supplemental briefing.
[7] As noted previously, the homeowners collectively may amend the CC & R's only after they own property in the complex (Civ.Code, § 1355), and in this particular case, the Villa Milano CC & R's provide that the homeowners may not amend the arbitration clause at all without the developer's consent.
[8] Code of Civil Procedure section 1298.7 provides: "In the event an arbitration provision is included in a contract or agreement covered by this title [sections 1298-1298.8], it shall not preclude or limit any right of action for bodily injury or wrongful death, or any right of action to which [Code of Civil Procedure] Section 337.1 or 337.15 is applicable."
[9] We are aware that in Izzi v. Mesquite Country Club (1986) 186 Cal.App.3d 1309, 231 Cal.Rptr. 315, the court held a purchase agreement containing an arbitration provision bound a condominium purchaser to arbitrate. However, that case preceded the enactment of Code of Civil Procedure section 1298.7 and did not involve construction or design defects.
[10] The Villa Milano CC & R's were recorded in 1992 and Civil Code section 1375 was enacted subsequently (Stats. 1995, ch. 864, § 1, pp. 5117-5121). While section 1375 is not indicative of public policy at the time the CC & R's were recorded, it reflects current public policy with respect to court access for the resolution of construction and design defect claims.
[11] This regulation became operative July 15, 1998 (Cal.Code Regs., tit. 10, § 2791.8, Register 98, No. 25 (June 15, 1998)), and therefore does not dictate the content of the CC & R's before us, which were recorded in 1992. However, we address the regulation in order to explore its potential significance as a current expression of public policy.
[12] California Code of Regulations, title 10, section 2791.8, subdivision (a), provides in part: "A . . . provision in the covenants, conditions and restrictions requiring arbitration of a dispute or claim between a homeowners association and a subdivider, shall provide that the arbitration will be conducted in accordance with the following rules and procedures: [¶] (1) For the subdivider to advance the fees necessary to initiate the arbitration . . .; [¶] (2) For administration of the arbitration by a neutral and impartial person(s); [¶] (3) For the appointment of a neutral and impartial individual(s) to serve as arbitrator(s) . . . [;] [¶] (4) For the venue of the arbitration to be in the county where the subdivision is located . . . [;] [¶] (5) For the prompt and timely commencement of the arbitration . . .; [¶] (6) For the arbitration to be conducted in accordance with rules and procedures which are reasonable and fair to the parties[;] [¶] (7) For the prompt and timely conclusion of the arbitration and] [¶] (8) For the arbitrators to be authorized to provide all recognized remedies available in law or equity for any cause of action that is the basis of the arbitration...."
[13] To the contrary, as some commentators tell it, the DRE followed a policy of disapproving mandatory binding arbitration provisions in CC & R's until a disgruntled developer successfully challenged the policy. (2 Hanna & Van Atta, supra, §§ 21:107-21:108, pp. 126-129.) Unfortunately, it appears the DRE did not seek review of the unfavorable trial court decision. (Id., § 21:108, p. 127.)
[14] Because we conclude the arbitration provision is unenforceable, we need not consider whether 11 Davorge has standing to enforce the CC & R's.