[No. B182555. Second Dist., Div. Five. Aug. 21, 2006.]

JOHN CEBULAR, Plaintiff and Appellant, v.
COOPER ARMS HOMEOWNERS ASSOCIATION, Defendant, and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

***Pursuant to California Rules of Court, Rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.A.7., III.A.8., III.B., and the last two paragraphs on page 130 of the concurring opinion.

**COUNSEL**

Crandall, Wade & Lowe and Matthew F. Batezel for Plaintiff and Appellant.

Haight Brown & Bonesteel, Bruce Cleeland, Rita Gunasekaran and Maureen Haight Gee for Defendant and Appellant.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

For nearly three quarters of a century, the Cooper Arms, a historic and beautiful 12-story apartment building in Long Beach, was a stock cooperative. The cooperative operated as a corporation. Unit owners in the stock cooperative owned shares in the corporation. Some residents owned more shares than others. When issues about the management and upkeep of the Cooper Arms arose, the stockholders would vote. And as with any corporation, the more shares a person owned, the greater her or his vote mattered. Speaking hypothetically, if a stockholder owned 25 percent of the shares, then that person's vote counted for 25 percent of the votes.

In 1995, 75 percent of the members of the cooperative decided to convert the property to condominiums. In doing so, the shares in the cooperative were converted to votes per unit. Some condominium unit owners could cast as few as 19 votes. Others could cast as many as 85 votes. As when the building was a cooperative, the more shares a owner held, the greater the impact of his or her vote on condominium issues. However, just as the votes are unequal—so too are the common area and other assessments. An owner with more votes pays a pro rata greater share of common area and other assessments. In other words, when a condominium owner has more votes, she or he assumes the expensive obligation to pay a greater pro rata contribution for common area and other assessments. The trial court ruled this methodology for distributing votes and imposing common area and other assessments was lawful and that is what this appeal is largely about.

Plaintiff, John Cebular, a condominium unit owner, appeals from a judgment entered in favor of defendant, Cooper Arms Homeowners Association, after a court trial based on the parties' trial briefs and several exhibits. Among other things, the trial court ruled that the declaration of covenants, conditions, and restrictions (the declaration) and bylaws did not violate the Davis-Stirling Common Interest Development Act (Civ. Code, § 1350 et seq.)[1] (the act) and our Supreme Court's decision in *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380–389 [33 Cal.Rptr.2d 63, 878 P.2d 1275], even though members are not equally assessed for maintenance of common area facilities. In the published part of the opinion, we address the trial court's rulings concerning assessments and voting rights and membership in the homeowners association. Other issues will be resolved in

---

[1] All further statutory references are to the Civil Code unless otherwise indicated.

the unpublished portion of the opinion. We affirm the trial court's rulings as to the legality of the voting and assessment methodology. We reverse the attorney fee award. We remand for recalculation of the attorney fees.

## II. BACKGROUND

### A. The Declaration

The Cooper Arms is a 12-story building containing 159 units. Built in 1923, the Cooper Arms was originally organized as a stock cooperative in which each unit owner bought shares of a corporation. The cooperative was created with the execution of a trust agreement, which assigned to each unit an inseparable fractional beneficial interest. The number of shares was established by the trust agreement and the owners paid a specified amount for the shares that they received at $100 par value. The Cooper Arms was identified as a historical landmark in 1979. Documents offered by the parties established that, in 1995, the members were given instructions on voting to convert the building to condominium units. The vote to convert required 75 percent of the owners but not 75 percent of the shares. The voters were informed that regular and special assessments would be distributed in the same proportion as the percentage of shares held in trust for each beneficiary.

On August 22, 1995, the owner of the building, Sharp Homeowners Association Management, Inc., executed a "Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for The Cooper Arms Condominiums" in order to convert the cooperative apartment building into a condominium project. The declaration's preamble provides in part, "All of the limitations, restrictions, reservations, rights, easements, conditions and covenants herein shall run with and burden the Property and shall be binding on and for the benefit of all the Property and all Persons having or acquiring any interest in the Property, or any part thereof, and their successive owners and assigns." The declaration was recorded in the Los Angeles County Recorder's Office on August 29, 1995. An amendment was recorded on December 4, 1995.

Before proceeding to an analysis of the specifics of the governing documents, it is appropriate to summarize the key parts of the declaration and bylaws which directly discuss the assessment and voting methodology. Exhibit D attached to the declaration and bylaws is entitled "UNDIVIDED INTERESTS IN COMMON AREA." The exhibit identifies each unit number and assigns it an interest. For example, unit 215 is assigned 19 "INTERESTS." By contrast, unit 1101 is assigned 85 "INTERESTS." Exhibit D states there are a total of 6,731 undivided interests in the common area. Pursuant to article 4, section 4.5 of the declaration, "All Annual Assessments

shall be assessed among the Owners and their Condominiums in proportion to the undivided interests listed on Exhibit 'D.' " Exhibit E lists the votes each condominium owner is entitled to cast. Exhibit E states the total number of votes is 6,731—the exact number of undivided interests identified in exhibit D" Further, the number of votes assigned to each condominium is exactly the same as the number of interests assigned to each condominium in exhibit D" By way of example, the owner of unit 215 has 19 interests in the common area. Also, exhibit E provides that the owner of unit 215 has 19 votes. The assignment of an equal number of interests and votes for each owner is true for every unit in the Cooper Arms.

Article I, section 1.2 of the declaration defines the term "annual assessment" as, "[An] Annual Assessment means a charge against the Owners and their Condominiums, representing a portion of the Common Expenses, which are to be levied as provided herein." Capital improvement, reconstruction, and special assessments are levied in the same proportion as annual assessments. Article I, section 1.15 defines "Common Expenses" as follows: "Common Expenses means those expenses for which the Association is responsible under this Declaration, including actual and estimated costs of: maintaining, managing, operating, repairing and replacing the Common Property; unpaid Special Assessments, Reconstruction Assessments and Capital Improvement Assessments; maintaining the ballroom, solarium, promenade, basement storage areas, showers, elevators, lockers and recreation areas on the Common Property; all utilities metered to more than one Unit and other commonly metered charges for the Property; trash collection and removal (as applicable); maintaining clustered mailboxes and address identification signs: managing and administering the Association including, but not limited to, compensation paid by the Association to managers, accountants, attorneys and other employees; gardening, security and other services benefiting the Common Property; fire, casualty, liability, workers' compensation, errors and omissions and director, officer and agent liability insurance, and other insurance covering the Property and the Directors, officers and agents of the Association; bonding the members of the Board; taxes paid by the Association, including any blanket tax assessed against the Property; amounts paid by the Association for discharge of any lien or encumbrance levied against the Property, or portions thereof; and all other items incurred by the Association, for any reason whatsoever in connection with the Property, for the common benefit of the Owners."

Article I, section 1.17 of the declaration provides: "Condominium means an estate in real property as defined in California Civil Code Section 1351(f). A Condominium consists of an undivided fee simple ownership interest in the Common Area, together with a separate ownership interest in fee in a Unit and all easements appurtenant thereto . . . . [T]he fractional undivided fee

simple interest appurtenant to each Unit shall be an undivided interest in the amount listed on Exhibit 'D' in the Common Area to be held by the Owners as tenants in common."

Article II, section 2.3 of the declaration states that every unit owner is a member of defendant. Article II, section 2.5 provides: "The Association shall have one class of voting membership. Members are all Owners. Members are entitled to the number of votes listed on Exhibit 'E' assigned to each Condominium owned by such Member which is subject to assessment." Article II, section 2.6 sets forth the voting member rights. Exhibit E sets forth the number of votes for each of the 159 condominium units ranging from 19 to 85 votes. The total number of votes is 6,731 for the entire project.

Article IV of the declaration sets forth the obligations to pay assessments. Article IV, section 4.1 provides: "Declarant, for each Condominium owned by it, hereby covenants to pay, and each Owner, by acceptance of a deed to a Condominium, whether or not it shall be so expressed in such deed, is deemed to covenant to pay to the Association (a) Annual Assessments, (b) Special Assessments, (c) Reconstruction Assessments and (d) Capital Improvement Assessments; such assessments to be established and collected as provided herein. The Association may not levy or collect any Annual Assessment, Capital Improvement Assessment, Special Assessment or Reconstruction Assessment that exceeds the amount necessary for the purpose for which it is levied." Article IV, section 4.3 identifies the purpose of the assessments as follows: "The assessments shall be used exclusively to (a) promote the Owner's recreation, health, safety and welfare, (b) operate, replace, improve and maintain the Common Property, and (c) discharge any other Association obligations under the Declaration." Article IV, section 4.5 states, "All Annual Assessments shall be assessed among the Owners and then Condominiums in proportion to the undivided interests listed on Exhibit 'D.' " As noted, exhibit D details the undivided 6,731 interests in the common area which equals the number of votes specified in exhibit E.

Article X of the declaration sets forth rights and restrictions for mortgagees. Section 10(d) of article X states: "Unless at least sixty-seven percent (67%) of the first Mortgagees or sixty-seven percent (67%) of the Owners have given their prior written approval, the Association may not: . . . [¶] (ii) change the pro rata interest or obligations of any Condominium in order to levy assessments . . . ; or . . . [¶] (viii) change the method of determining the obligations, assessments, dues or others charges which may be levied against any Owner."

Article XI, section 11.2 of the declaration provides for an amendment of the declaration as follows: "(a) . . . To be effective, a proposed amendment must be adopted by the vote, in person or by proxy, or written consent of Members representing not less than a majority of a quorum of the voting power of the Association; provided that the specified percentage of the Association's voting power necessary to amend a specified Section or provision of this Declaration may not be less than the percentage of affirmative votes prescribed for action to be taken under that Section or provision. [¶] (b) In addition to the required notice and consent of Members provided above, the Beneficiaries of fifty-one percent (51%) of the first Mortgages on all the Condominiums in the Project who have requested the Association to notify them of proposed action requiring the consent of a specified percentage of first Mortgagees must approve any amendment to this Declaration which is of a material nature, as follows: [¶] (i) Any amendment which affects or purports to affect the validity or priority of Mortgages or the rights or protection granted to Beneficiaries, insurers or guarantors of first Mortgages as provided in Articles IV, VII, VIII, IX, X, and XI hereof. . . . [¶] (vii) Any amendment concerning: [¶] (A) Voting rights; . . . [¶] (D) Responsibility for maintenance and repairs; . . . [¶] (K) Increases in assessments that raise the previously assessed amount by more than twenty-five percent (25%), assessment liens, . . . [¶] (c) Termination of this Declaration requires approval of at least seventy-five percent (75%) of the voting power of the Association. No such termination is effective unless it is also approved in advance either by fifty-one percent (51%) of the Beneficiaries of the first Mortgages on all of the Condominiums in the Project who have submitted a written request to the Association that they be notified of proposed actions requiring the consent of a specified percentage of such Beneficiaries (if termination is proposed due to substantial destruction or condemnation of the Project) or by sixty-seven percent (67%) of such Beneficiaries (if termination is for reasons other than such substantial destruction or condemnation)."

Article XII, section 12.10 of the declaration states, "Every person who owns, occupies or acquires any right, title, estate or interest in or to any Condominium or other portion of the Property does hereby consent and agree, and shall be conclusively deemed to have consented and agreed, to every limitation, restriction, easement, reservation, condition and covenant contained herein, whether or not any reference to these restrictions is contained in the instrument by which such person acquired an interest in the Property or any portion thereof." Article XII, section 12.11 provides, "Notwithstanding the provisions contained in the Restrictions, the Association and the Owners should be aware that there may be provisions of various laws,

including without limitation the Davis-Stirling Common Interest Development Act codified at Sections 1350 et seq. of the California Civil Code and the federal Fair Housing Act codified at Title 42 United States Code, Sections 3601 et seq., which may supplement or override the Restrictions."

The bylaws also regulate the voting by members. As noted previously, a condominium owner is a member for voting purposes. Section 2.1 of the bylaws provides: "The Association has one (1) class of voting Membership. Members are entitled to the number of votes listed on Exhibit 'E' to the Declaration for each Condominium owned which is subject to assessment, as further provided in the Declaration. All voting rights are subject to the Restrictions." Section 2.2 of the bylaws indicates that a majority of a quorum of members is required to take any action. Further, a majority of defendant's voting power constitutes a quorum.

Section 7 of the bylaws provides: "These Bylaws may be amended by the vote or written consent of Members representing at least a majority of the voting power of the Members; provided that the specified percentage of Members necessary to amend a specific Section or provision of these Bylaws may not be less than the percentage of affirmative votes prescribed for action to be taken under that Section or provision. . . . In addition to the foregoing, any amendment to these Bylaws which materially affects matters delineated in Article X or Section 11.2 of the Declaration must be approved by the Beneficiaries of that percentage of first Mortgages on the Condominiums which is specified in the affected provision of Article X or Section 11.2 of the Declaration, respectively; provided that, if an amendment to these Bylaws materially affects matters delineated in both Article X and Section 11.2 of the Declaration or purports to amend this sentence, the amendment must be approved pursuant to the requirements of both said Article X and Section 11.2."

In May 1996, the bylaws were amended to provide for cumulative voting as follows: "2.5 Cumulative Voting. The method of Cumulative voting shall be used to elect candidates to the board of Directors. Each member shall be entitled to vote at an election of Directors where two or more positions are to be filled. A member has a right to cumulate his or her vote in the following manner: Multiply the number of votes allotted to one's unit (see Schedule 'E' in the Bylaws) times the number of Directors to be elected. The results will be the number of votes permitted to be cast in the election. One may cast all his or her votes for one candidate or distribute them among as many candidates as are running." (Original underscoring.)

## B. The Pleadings

On January 9, 2004, plaintiff filed the complaint alleging causes of action for: contract breach (first); implied covenant of good faith and fair dealing breach (second); declaratory relief (third); negligence (fourth); fiduciary duty breach (fifth); injunctive relief (sixth); and unfair competition (seventh). The trial court sustained demurrers to the second, fourth, and sixth causes of action without leave to amend. The trial court sustained a demurrer to the contract breach claim (first) with leave to amend. The trial court overruled demurrers to declaratory relief (third), fiduciary duty breach (fifth), and unfair competition (seventh) causes of action. We summarily denied a mandate petition filed by defendant brought on the ground all the claims were time-barred. (*Cooper Arms Homeowners Association v. Superior Court* (Apr. 29, 2004, B174383) [nonpub. opn.].)

The first amended complaint, which is the operative pleading, alleges plaintiff purchased a condominium within the Cooper Arms in September 1997. Upon purchasing the condominium, plaintiff became bound by the August 1995 declaration as amended. Plaintiff further alleges: defendant's members are assessed based on the number of assigned shares; plaintiff is unaware of how the shares are calculated or assigned; unit shares are assigned without reference to size or location of the unit; some larger units have fewer shares; the assessment method does not take into consideration that each member is entitled to equally share the common area located on the property; the distribution of shares is thereby inequitable, arbitrary, and capricious; and each member should be equally assigned maintenance obligations. Further, plaintiff alleges he had "periodically" been a board member since approximately January 2001. Plaintiff alleges on information and belief the board had been advised by counsel that the method of allocating shares, voting, and assessing the members is unfair, inequitable, arbitrary, and capricious and does not conform to applicable laws. The first amended complaint contains causes action for: contract breach (first); declaratory relief (second); fiduciary duty breach (third); and unfair competition (fourth). The trial court sustained a demurrer without leave to amend as to the contract breach cause of action (first). But the trial court overruled demurrers, which were brought in part on statute of limitations grounds, as to the remaining causes of action. Defendant answered the first amended complaint. The trial court subsequently denied defendant's summary judgment motion.

## C. The Trial, Judgment, and Attorney Fee Order

Thereafter, the parties stipulated to a court trial on the declaratory relief and unfair competition claims based on the trial briefs and certain exhibits. At the January 6, 2005 hearing, the trial court ruled that the unfair competition claim was time-barred. After the January 6, 2005 hearing, the trial

court took the declaratory relief claim under submission. On January 21, 2005, the trial court entered judgment against plaintiff on the declaratory relief cause of action. The judgment states, "[N]either the share method, [the declaration], nor the allocation method violate California law generally or the Davis-Stirling Act specifically." Thus, the only claims before us are plaintiff's declaratory relief and unfair competition claims. This timely appeal followed.

## III. DISCUSSION

### A. Plaintiff's Appeal

#### 1. Summary of issues discussed in the published portion of the opinion

Relying primarily upon *Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at pages 380–389, plaintiff argues defendant is violating the act by utilizing a method of allocation of assessments to members based upon what he characterizes as a share scheme. Plaintiff argues voting rights and assessments must be allocated equally. Plaintiff further contends the voting and assessment allocation methodology violates Business and Professions Code section 17200 as an unfair business practice. Moreover, plaintiff contends the assessment and voting method violate Corporations Code section 7312 which applies to common interest developments. Finally, plaintiff argues the unfair business practice claim was not time-barred.

#### 2. The act and *Nahrstedt*

■ As noted above, the declaration and bylaws which govern the building were recorded on August 29, 1995. The owners are bound by the declaration. (§§ 1351, 1353; *Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 368, fn. 1.) The declaration was recorded after owners of the cooperative agreed to convert the building to a condominium. There are marked distinctions between a stock cooperative and a condominium. (*California Coastal Com. v. Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 596–598 [170 Cal.Rptr. 263]; *Sun Terrace Manor v. Municipal Court* (1973) 33 Cal.App.3d 739, 743–744 [108 Cal.Rptr. 307].) A stock cooperative is a corporation formed to hold title to real property. The shareholders are given a proprietary interest in occupying a portion of the real property. (§ 1351, subd. (m);[2] *California Coastal Com. v. Quanta Investment*

---

[2] Section 1351, subdivision (m) defines the term stock cooperative as follows: " 'Stock cooperative' means a development in which a corporation is formed or availed of, primarily for the purpose of holding title to, either in fee simple or for a term of years, improved real property, and all or substantially all of the shareholders of the corporation receive a right of

*Corp., supra,* 113 Cal.App.3d at pp. 596–597.) The right of occupancy is generally made by a transfer of stock granting the holder a proprietary lease. (*California Coastal Com. v. Quanta Investment Corp., supra,* 113 Cal.App.3d at pp. 596–597; *Sun Terrace Manor v. Municipal Court, supra,* 33 Cal.App.3d at p. 744.) The shareholder in a stock cooperative is merely a lessee, which has a landlord-tenant relationship with the stock cooperative and owner of the land. (*California Coastal Com. v. Quanta Investment Corp., supra,* 113 Cal.App.3d at pp. 596–597; *Sun Terrace Manor v. Municipal Court, supra,* 33 Cal.App.3d at p. 744.) By contrast, section 1351, subdivision (f) describes a condominium as follows, "A condominium consists of an undivided interest in common in a portion of real property coupled with a separate interest in space called a unit . . . ." (See *California Coastal Com. v. Quanta Investment Corp., supra,* 113 Cal.App.3d at pp. 596–597.) ■ A condominium owner acquires a fee simple interest in real property. (*Friendly Village Community Assn., Inc. v. Silva & Hill Constr. Co.* (1973) 31 Cal.App.3d 220, 224–225 & fn. 3 [107 Cal.Rptr. 123]; see *Adler v. Elphick* (1986) 184 Cal.App.3d 642, 647, fn. 4 [229 Cal.Rptr. 254].) Notwithstanding these distinctions, in 1995, 75 percent of the owners agreed to maintain the previous allocation method for maintenance and operation of the common areas once the condominium conversion was completed. Their agreement was set forth in the governing documents (the declaration and bylaws) which were filed and recorded in 1995.

■ Plaintiff argues this assessment allocation is unlawful. The California Legislature has chosen "the deferential standard applicable to equitable servitudes" as the standard for enforcing covenants, conditions, and restrictions in declarations governing a common interest development. (*Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 368; see *Villa De Las Palmas Homeowners Assn. v. Terifaj* (2004) 33 Cal.4th 73, 88 [14 Cal.Rptr.3d 67, 90 P.3d 1223].) The standards for enforcement of condominium covenants, conditions, and restrictions are set forth in the act. (§ 1350 et seq.) Section 1354, subdivision (a) provides: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both." ■ Our Supreme Court has interpreted section

exclusive occupancy in a portion of the real property, title to which is held by the corporation. The owners' interest in the corporation, whether evidenced by a share of stock, a certificate of membership, or otherwise, shall be deemed to be an interest in a common interest development and real estate development for purposes of subdivision (f) of Section 25100 of the Corporations Code."

1354, subdivision (a) to mean that covenants, conditions, or restrictions are enforceable unless the party challenging it establishes the equitable servitude is " 'unreasonable' " because it is wholly arbitrary, violates a fundamental public policy, or imposes a burden on the use of affected land that far outweighs any benefit. (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at pp. 379–380, 382, 389; accord, *Villa De Las Palmas Homeowners Assn. v. Terifaj*, *supra*, 33 Cal.4th at p. 88.) A homeowners association can neither rely on nor enforce covenants, conditions, and restrictions that violate statutory law or common law. If there is a conflict between the law and a declaration of covenants, conditions, and restrictions, the statutory and common law prevail. (*Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499, fn. 6 [229 Cal.Rptr. 456, 723 P.2d 573]; *Thaler v. Household Finance Corp.* (2000) 80 Cal.App.4th 1093, 1102 [95 Cal.Rptr.2d 779]; *14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1406–1407 [74 Cal.Rptr.2d 712].) Indeed, as noted, article XII, section 12.11 of the declaration recognizes the predominance of statutory law in the event of a conflict by stating, "Notwithstanding the provisions contained in the Restrictions, the Association and Owners should be aware that there may be provisions of various laws, including without limitation the Davis-Stirling Common Interest Development Act codified at Sections 1350 et seq. of the California Civil Code and the federal Fair Housing Act codified at Title 42 United States Code, Sections 3601 et seq., which may supplement or override the Restrictions."

■ Plaintiff's challenge to the declaration and bylaws must be resolved in part based on contract principles. (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at pp. 380–381 [restrictive covenants are subject to contract interpretation]; *Hannula v. Hacienda Homes, Inc.* (1949) 34 Cal.2d 442, 444–445 [211 P.2d 302] [same].) Further, the construction of the act is based on rules applicable to statutory construction. (*Villa De Las Palmas Homeowners Assn. v. Terifaj*, *supra*, 33 Cal.4th at p. 82 [interpretation of the act]; see *Battram v. Emerald Bay Community Assn.* (1984) 157 Cal.App.3d 1184, 1189 [204 Cal.Rptr. 107] [interpretation of assessment in light of Proposition 13].) To the extent the declaratory relief claim was decided on stipulated and undisputed evidence, our review of the matter is de novo. (*Dolan-King v. Rancho Santa Fe Assn.* (2000) 81 Cal.App.4th 965, 974 [97 Cal.Rptr.2d 280]; *Ironwood Owners Assn. IX v. Solomon* (1986) 178 Cal.App.3d 766, 771 [224 Cal.Rptr. 18]; see also *Topanga and Victory Partners v. Toghia* (2002) 103 Cal.App.4th 775, 780–781 [127 Cal.Rptr.2d 104].)

### 3. Neither the statutory nor regulatory language prohibits unequal allocation of interests

■ Neither the act nor the California Code of Regulations requires that equal assessments be imposed in *every* case. Section 1362 provides: "*Unless the declaration otherwise provides*, in a condominium project, or in a planned development in which the common areas are owned by the owners of the separate interests, the common areas are owned as tenants in common, in equal shares, one for each unit or lot." (Italics added.) California Code of Regulations, title 10, section 2792.16 provides in part: "(a) Regular assessments to defray expenses attributable to the ownership, operation and furnishing of common interests by the Association shall ordinarily be levied against each owner according to the ratio of the number of subdivision interests owned by the owner assessed to the total number of interests subject to assessments. [¶] (b) In the case of a subdivision offering in which it is reasonable to anticipate that any owner will derive as much as 10% more than any other owner in the value of common services supplied by the Association, the assessment against each owner may be determined according to a formula or schedule under which the assessments against the various subdivision interests bear a relationship which is equitably proportionate to the value of the common services furnished to the respective interests." Thus, both section 1362 and California Code of Regulations, title 10, section 2792.16, subdivisions (a) and (b) contemplate that the declaration may provide for unequal ownership by condominium owners of common areas as tenants in common. As a result, neither section 1362 nor any regulation prohibit unequal assessments based upon greater voting power.

### 4. The voting and common area expense allocation is not unreasonable

■ Plaintiff argues the method for determining the allocation is "wholly arbitrary" because it is not based on criteria such as value, square footage, elevation, or ocean views. In other words, according to plaintiff, even if the allocation formula violates neither a statute nor a regulation, it is invalid because it is entirely arbitrary. First, as plaintiff concedes, a recorded land use restriction in a common interest development is *presumptively reasonable* and will not be set aside unless it is found to be arbitrary or violates fundamental public policy. (*Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 368; accord, *Villa De Las Palmas Homeowners Assn. v. Terifaj, supra,* 33 Cal.4th at pp. 90–91.) The purpose of the presumption of validity, requiring a challenger to demonstrate unreasonableness, is to promote stability and predictability in condominiums and other common interest developments. (*Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at pp. 382–383; see *Villa Milano Homeowners Assn. v. Il Davorge* (2000) 84

Cal.App.4th 819, 835–836 [102 Cal.Rptr.2d 1].) The declaration in this case, allocating unequal assessments based on the proportionate share of voting rights, is thus presumptively valid.

■ Second, we agree with defendant that, to the extent the dissimilar assessments are tied to a proportionate allocation of voting rights in the common interest development, they are not wholly arbitrary. This is because the evidence indisputably established that the methodology for common area assessments is directly tied to voting rights. The members' voting rights range from 19 to 85 votes. The greater the number of votes, the proportionately larger the assessment imposed on the owner. The assessments are levied based on the number of votes listed in exhibit E to the bylaws for each unit. This method was originally adopted in 1923 under the document entitled, "Declaration of Trust No. 31 of the California National Bank of Long Beach." When the building was converted to condominiums in 1995, 75 percent of the cooperative shareowners agreed to adopt this method. At the time of the conversion from a cooperative apartment building to condominiums, the members chose to have a proportional assessment based on the disparate allocation of voting rights in the homeowners association. This unequal assessment translates to a greater right to control, manage, and maintain the property. (Bus. & Prof. Code, § 11018.5, subd. (d); Cal. Code Regs., tit. 10, § 2792.8, subd. (a)(3).) The choice to pay more based on an increased voting power is neither "unreasonable" nor "wholly arbitrary" as a matter of law.

There is no merit to the contentions pressed in the reply brief and at oral argument that the greater voting power is a matter of little consequence. Plaintiff has presented no concrete evidence to support this contention. No doubt, it is conceivable greater voting power linked to higher assessments in a homeowners association could, under some circumstances, be an entirely illusionary benefit. But plaintiff's speculative analysis is just that—he presented no evidence in the trial court to support the conclusion that greater voting power is not a material benefit to a condominium owner. The voting rights provided to unit owners under the declaration and bylaws are substantial. They include: the power to change the pro rata method for collecting assessments if 67 percent of the owners approve; amending the declaration with the consent of 51 or 67 percent of the members depending on the nature of the change; termination of the declaration with the consent of 75 percent of the voting power; calling special meetings if 5 percent of the voting power approves; electing and removing directors; permitting the borrowing of money if 75 percent of the voting power approves; demanding a statement of association affairs upon the request of 10 percent of the voting membership; selling property of the homeowners association with the consent of a majority of the voting power; extending the term of employment of the management agent with the approval of a majority of the voting power; limiting discussion

at regular and special board meetings; setting compensation of employees; and amending the bylaws with the approval of a majority of the voting power. These are substantial rights and plaintiff's contention to the contrary has no merit.

■ Third, the assessment method is not unreasonable merely because plaintiff disagrees with its wisdom. Our Supreme Court has explained, "[W]hen enforcing equitable servitudes, courts are generally disinclined to question the wisdom of agreed-to restrictions." (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 381.) Further, in *Nahrstedt*, the Supreme Court has explained: "Under the law of equitable servitudes, courts may enforce a promise about the use of land even though the person who made the promise has transferred the land to another. (See *Marra v. Aetna Construction Co.* (1940) 15 Cal.2d 375, 378 [101 P.2d 490].) The underlying idea is that a landowner's promise to refrain from particular conduct pertaining to land creates in the beneficiary of that promise 'an equitable interest in the land of the promisor.' (Rest., Property, § 539, com. *a*, p. 3227; 2 Pomeroy, Equity Jurisprudence (2d ed. 1886) § 689, quoted in *Hunt v. Jones* (1906) 149 Cal. 297, 301 [86 P. 686] [a grantee or purchaser with notice that premises are bound by a covenant ' "will be restrained from violating it." '].)" (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at p. 379.)

■ Fourth, there is no merit to plaintiff's claim that enforcing the declaration would violate public policy. In *Nahrstedt*, our Supreme Court explained the public policy factor as follows: "[E]quitable servitudes permit courts to enforce promises restricting land use when there is no privity of contract between the party seeking to enforce the promise and the party resisting enforcement. Like any promise given in exchange for consideration, an agreement to refrain from a particular use of land is subject to contract principles, under which courts try 'to effectuate the legitimate desires of the covenanting parties.' (*Hannula v. Hacienda Homes*[, *supra*,] 34 Cal.2d [at pp.] 444–445.) When landowners express the intention to limit land use, 'that intention should be carried out.' (*Id.* at p. 444; Epstein, *Notice and Freedom of Contract in the Law of Servitudes* (1982) 55 So.Cal.L.Rev. 1353, 1359 ['We may not understand why property owners want certain obligations to run with the land, but as it is *their* land . . . some very strong reason should be advanced' before courts should override those obligations. (Original italics.)].) [¶] Thus, when enforcing equitable servitudes, courts are generally disinclined to question the wisdom of agreed-to restrictions. [Citations.] This rule does not apply, however, when the restriction does not comport with public policy. [Citation.] Equity will not enforce any restrictive covenant that violates public policy. [Citations.]" (*Nahrstedt v. Lakeside Village Condominium Assn.*, *supra*, 8 Cal.4th at pp. 380–381; see also Rest.3d

Property, Servitudes, § 3.1, com. j, p. 368 ["Absent extraordinary circumstances, if a servitude serves some purpose that the purchasers might rationally have agreed to, and its meaning should have been apparent to the purchasers, a court should not invalidate it simply because the court believes that most people would not have agreed to it, or that it produces little benefit"].) In *Nahrstedt*, our Supreme Court cited as examples of restrictions that violate public policy—racially restrictive covenants in deeds as invalidated in *Shelley v. Kraemer* (1948) 334 U.S. 1, 23 [92 L.Ed. 1161, 68 S.Ct. 836] and unlawful discrimination based on sex, race, color, religion, ancestry, national origin, or disability as set forth in section 53, subdivision (b).[3] (*Nahrstedt v. Lakeside Village Condominium Assn., supra*, 8 Cal.4th at p. 381.)

 Here, plaintiff has failed to demonstrate that enforcement of the declaration in this case violates any fundamental policy that inures to the public at large. Indeed, the contrary may be true because of the potential disruption to the expectations of the other unit owners in the building. At least 75 percent of the prior cooperative owners voted to maintain the continuity of the voting and assessment method for the building which is a historic landmark. The current owners then purchased their units with the same understanding of control and payment of higher assessment dues for the added voting power. California law recognizes that postconversion purchasers' expectations in place when they made their investments warrant protection. (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 264 [87 Cal.Rptr.2d 237, 980 P.2d 940] ["giving deference to a development's originating CC&R's 'protects the general expectations of condominium owners "that restrictions in place at the time they purchase

---

[3] Section 53, subdivision (b) states, "Every restriction or prohibition, whether by way of covenant, condition upon use or occupation, or upon transfer of title to real property, which restriction or prohibition directly or indirectly limits the acquisition, use or occupation of that property because of any characteristic listed or defined in subdivision (b) or (e) of Section 51 is void." Section 51, subdivisions (b) and (e) state: "(b) All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever. [¶] . . . [¶] (e) For purposes of this section: (1) 'Disability' means any mental or physical disability as defined in Sections 12926 and 12926.1 of the Government Code. [¶] (2) 'Medical condition' has the same meaning as defined in subdivision (h) of Section 12926 of the Government Code. [¶] (3) 'Religion' includes all aspects of religious belief, observance, and practice. [¶] (4) 'Sex' has the same meaning as defined in subdivision (p) of Section 12926 of the Government Code. [¶] (5) 'Sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation' includes a perception that the person has any particular characteristic or characteristics within the listed categories or that the person is associated with a person who has, or is perceived to have, any particular characteristic or characteristics within the listed categories. [¶] (6) 'Sexual orientation' has the same meaning as defined in subdivision (q) of Section 12926 of the Government Code."

their units will be enforceable" ' "]; *Dolan-King v. Rancho Santa Fe Assn., supra,* 81 Cal.App.4th at p. 975 ["Such deference to the originating covenants, conditions and restrictions ' "protects the general expectations of condominium owners 'that restrictions in place at the time they purchase their units will be enforceable' " ' "].)

Finally, plaintiff claims he lacked notice of the method of allocating votes and the duty to pay greater assessments. But, the undisputed evidence established that the assessment method was contained in the declaration and bylaws. Plaintiff does not contend that the documents were not properly executed or recorded. Plaintiff's lack of notice contention appears to be the basis of a public policy challenge to enforcement of the equitable servitudes at issue. (*Lamden v. La Jolla Shores Clubdominium Homeowners Assn., supra,* 21 Cal.4th at p. 263; *Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th at p. 382.) Plaintiff had constructive notice of the assessment method based on voting rights when he purchased his property in 1997. (§ 1213; *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 349 [47 Cal.Rptr.2d 898, 906 P.2d 1314]; *Villa Milano Homeowners Assn. v. Il Davorge, supra,* 84 Cal.App.4th at p. 825; *Thaler v. Household Finance Corp., supra,* 80 Cal.App.4th at p. 1099.) Plaintiff's claimed, but factually unsubstantiated, lack of notice contention is not a basis for finding the assessment and voting methodology violates fundamental public policy. No violation of the act or the rule set forth by the Supreme Court in *Nahrstedt* has occurred.

### 5. The assessment and voting rights methodology does not violate the additional statutes plaintiff cites

Plaintiff makes a number of separate additional arguments concerning alleged violations of the act, none of which have merit. Our prior analysis is dispositive of the following arguments. First, plaintiff contends that the method violates section 1366.1[4] which prohibits excessive assessments of fees. In a similar contention, plaintiff asserts defendant violated article IV, section 4.1 of the declaration which provides it may not assess its members more than necessary for the purpose for which it was levied. He argues that the unequal assessment arbitrarily and unreasonably assesses some members for higher maintenance for the common areas even though the members share equally in the benefits of the common areas. Second, plaintiff asserts section 1368.1[5] is violated because the assessment and voting rights unfairly and

---

[4] Section 1366.1 provides: "An association shall not impose or collect an assessment or fee that exceeds the amount necessary to defray the costs for which it is levied."

[5] Section 1368.1 provides in part: "(a) Any rule or regulation of an association that arbitrarily or unreasonably restricts an owner's ability to market his or her interest in a common interest development is void."

unreasonably restrict the marketability of his condominium. Third, plaintiff asserts the voting and assessment methodology violates section 1357.110[6] because it is unreasonable and arbitrary. However, the methodology chosen by the owners wishing to pay more in assessments in exchange for greater voter power is neither unlawful nor unreasonable a matter of law, as we have explained.

### 6. Corporations Code section 7312 and membership

Defendant's articles of incorporation state that it is organized under the Nonprofit Mutual Benefit Corporation Law. (Corp. Code, § 7110 ["This part shall be known and may be cited as the Nonprofit Mutual Benefit Corporation Law"]; see *Ostayan v. Nordhoff Townhomes Homeowners Assn., Inc.* (2003) 110 Cal.App.4th 120, 127 [1 Cal.Rptr.3d 528].) Plaintiff argues the voting and assessment allocation methodology violates Corporations Code section 7312. Plaintiff asserts, "Corporations Code section 7312 states that no person may hold more than one membership unless the person owns more that one unit." Plaintiff further contends that each member must have the same rights and privileges and relies upon the holding in *Erickson v. Gospel Foundation of Calif.* (1954) 43 Cal.2d 581, 585 [275 P.2d 474]. We respectfully disagree with both lines of analysis.

Corporations Code section 7312, which is part of the Nonprofit Mutual Benefit Corporation Law, states in part, "No person may hold more than one membership, and no fractional memberships may be held" and then lists a series of exemptions none of which is directly relevant here.[7] Membership in a nonprofit mutual benefit corporation is defined in Corporations Code

---

[6] Section 1357.110 provides: "An operating rule is valid and enforceable only if all of the following requirements are satisfied: [¶] (a) The rule is in writing. [¶] (b) The rule is within the authority of the board of directors of the association conferred by law or by the declaration, articles of incorporation or association, or bylaws of the association. [¶] (c) The rule is not inconsistent with governing law and the declaration, articles of incorporation or association, and bylaws of the association. [¶] (d) The rule is adopted, amended, or repealed in good faith and in substantial compliance with the requirements of this article. [¶] (e) The rule is reasonable."

[7] Corporations Code section 7312 provides in part: "No person may hold more than one membership, and no fractional memberships may be held, provided, however, that: [¶] (a) Two or more persons may have an indivisible interest in a single membership when authorized by, and in a manner or under the circumstances prescribed by, the articles or bylaws subject to Section 7612. [¶] (b) If the articles or bylaws provide for classes of membership and if the articles or bylaws permit a person to be a member of more than one class, a person may hold a membership in one or more classes. [¶] (c) Any branch, division, or office of any person, which is not formed primarily to be a member, may hold a separate membership. [¶] (d) In the case of membership in an owners association, (as defined in Section 11003.1 of the Business and Professions Code, and created in connection with any of the forms of development referred to in Section 11004.5 of the Business and Professions Code) the articles or bylaws may permit a person who owns an interest, or who has a right of exclusive occupancy, in more than one lot,

section 5056.[8] Plaintiff argues that the voting and assessment allocation methodology unlawfully creates several different memberships—members who must pay greater assessments than others. However, members' rights are those specified in the corporation's articles and bylaws. (Corp. Code, § 5057 ["A 'membership' refers to the rights a member has pursuant to a corporation's articles, bylaws and this division"].) Further, Corporations Code section 5330 explicitly provides that corporate articles and bylaws may grant different privileges and conditions of membership. Corporations Code section 5330 states, "A corporation may issue memberships having different rights, privileges, preferences, restrictions or conditions, as authorized by its articles or bylaws." Corporations Code section 5331 states, "Except as provided in or authorized by the articles or bylaws, all memberships shall have the same rights, privileges, preferences, restrictions and conditions." ▮ As can be noted, the Corporations Code expressly allows the articles and bylaws to create different rights and conditions of membership. (9 Witkin, Summary of Cal. Law (10th ed. 2005) Corporations, § 304, p. 1058.)

In this case, the articles create one type of membership. Article II, section 2.5 of the articles of incorporation states: "The Association shall have one class of voting membership. Members are all owners. Members are entitled to the number of votes listed in Exhibit 'E' assigned to each condominium owned by such Member which is subject to assessment." Assessments are imposed in the same percentage as voting rights by article IV, section 4.5. By its very terms, the articles create only one class of member as mandated by Corporations Code section 7312—an owner—and proceed as permitted by Corporations Code sections 5330 and 5331 to identify the rights and conditions of membership. There has been no violation of Corporations Code section 7312.

---

parcel, area, apartment, or unit to hold a separate membership in the owners' association for each lot, parcel, area, apartment, or unit."

[8] *Corporations Code section 5056 states in its entirety:* "(a) 'Member' means any person who, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote for the election of a director or directors or on a disposition of all or substantially all of the assets of a corporation or on a merger or on a dissolution unless the provision granting such right to vote is only effective as a result of paragraph (2) of subdivision (a) of Section 7132. 'Member' also means any person who is designated in the articles or bylaws as a member and, pursuant to a specific provision of a corporation's articles or bylaws, has the right to vote on changes to the articles or bylaws. [¶] (b) The articles or bylaws may confer some or all of the rights of a member, set forth in this part and in Parts 2 through 5 of this division, upon any person or persons who do not have any of the voting rights referred to in subdivision (a). [¶] (c) Where a member of a corporation is not a natural person, such member may authorize in writing one or more natural persons to vote on its behalf on any or all matters which may require a vote of the members. [¶] (d) A person is not a member by virtue of any of the following: [¶] (1) Any rights such person has as a delegate. [¶] (2) Any rights such person has to designate or select a director or directors. [¶] (3) Any rights such person has as a director."

Finally, there is nothing in *Erickson v. Gospel Foundation of Calif.*, *supra*, 43 Cal.2d at page 585 which warrants a different result. *Erickson* involves the application of corporate security laws in existence more than one-half century ago applicable to nonprofit corporations. In any event, in *Erickson*, the bylaws provided greater voting rights if a member gave $1,000 to the corporation. The Supreme Court expressly upheld the unequal voting right methodology. (*Ibid.*) Our analysis, based on a different factual scenario and albeit similar laws, reaches the same ultimate outcome. The *Erickson* opinion does not support plaintiff's position.

7, 8.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. The Cross-appeal*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment is affirmed except as to the attorney fee award. The order awarding attorney fees is reversed and remanded for a determination of attorney fees under Civil Code sections 1717, subdivision (a) and 1354, subdivision (c). Defendant, Cooper Arms Homeowners Association, is awarded its costs and attorney fees on appeal from plaintiff, John Cebular.

Kriegler, J., concurred.

**MOSK, J., Concurring.**—I concur.

Originally a stock cooperative held title to the residential property at issue. (Civ. Code, § 1351, subd. (m).)[1] Each occupant of a unit in the premises acquired shares of stock for a price and executed a lease. The shareholders acquired their shares for different sums of money, presumably reflecting the market prices at the time of purchase. Thus, the shareholders' interests in the cooperative varied based on the

---

*See footnote, *ante*, page 106.

[1] All further statutory references are to the Civil Code unless otherwise stated.

number of shares of stock they purchased. Stock ownership determined voting rights.

The cooperative was then converted into a condominium. Under the terms of the declaration of the newly formed condominium, the amount of stock each unit holder owned determined the percentage of the "undivided interests in common area possessed by each unit holder" in the condominium. The amount of each undivided interest in the common area of the condominium determined the number of votes accorded to a unit holder, and in turn, the amount of assessments to be paid by that unit holder. The assessments are not restricted to common area expenses. They are for "common expenses" that include expenses "for all other items incurred by the Association, for any reason whatsoever in connection with the Property."

The only possible justifications for the differences in assessments for comparable units in the condominium are the differing percentages of undivided interests in the common area and voting power. There is no indication that a larger undivided interest in the common area has any more tangible value than a smaller interest or is related to the assessments. Attributing value to the percentage of interest in the common area would be theoretical.[2] Thus, defendant relies primarily on voting power to justify the differences in assessments. Plaintiff contends that the direct correlation between the amount that the unit owner is assessed and the unit owner's voting right is "wholly arbitrary." "Wholly arbitrary" is a ground for determining that a covenant, condition, or restriction in the governing documents of a condominium is not enforceable. (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 382 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*).)

For historical reasons, identical units pay different assessments. Whether or not the correlation between votes and assessments made sense in 1923 when the stock cooperative was established, the connection seems more tenuous today for the condominium. Yet, voting power appears to be of some significance. Each member may cast the number of votes he or she has for the board of directors, which elects officers and administers the affairs of the condominium association. The members may also cast their votes for matters that come to the membership. Plaintiff argues that realistically the members having more votes than others cannot dictate their positions on issues. But this assumes bloc voting based on assessment amounts. More voting power is undeniably better than less voting power.

---

[2] The percentage of interests conceivably could have some significance in the event of condemnation of the entire premises and other means of termination of the condominium. (See § 1351, subd. (e)(3)(B), (C), (D).)

I recognize that many condominium owners in the place of plaintiff would forgo the increased voting power for lower assessment amounts. But the Supreme Court has stated that under section 1354, a use restriction for a common interest development set forth in a recorded declaration is an enforceable equitable servitude unless "unreasonable" and that "unreasonableness" means a restriction that is "wholly arbitrary, violate[s] a fundamental public policy, or impose[s] a burden on the use of affected land that far outweighs any benefit." (*Nahrstedt, supra,* 8 Cal.4th at p. 382.) Although the term "arbitrary" is "extremely complex in law" and its sense "not readily encapsulated" (Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 73), the Supreme Court's use of the word "wholly" to modify "arbitrary" suggests that if arbitrariness can have gradations, it would have to be egregious to result in the invalidation of a restriction.

The Supreme Court listed a number of public policy reasons for its test for unreasonableness in connection with the issue of enforceability of condominium restrictions. These reasons include the reliance of the members, the reduction in litigation, and the "strain on the social fabric of the common interest development" if enforcement of provisions was on a case-by-case basis. (*Nahrstedt, supra,* 8 Cal.4th at p. 384.) The relationship between interests in common areas and voting power on the one hand and assessments on the other hand may be slender, but a methodology based on that relationship has not been established in this case to be "wholly arbitrary."

Plaintiff points to Department of Real Estate regulation No. 2792.16 that states, "(a) Regular assessments to defray expenses attributable to the ownership, operation and furnishing of common interests by the Association shall ordinarily be levied against each owner according to the ratio of the number of subdivision interests owned by the owner assessed to the total number of interests subject to assessments. [¶] (b) In the case of a subdivision offering in which it is reasonable to anticipate that any owner will derive as much as 10% more than any other owner in the value of common services supplied by the Association, the assessment against each owner may be determined according to a formula or schedule under which the assessments against the various subdivision interests bear a relationship which is equitably proportionate to the value of the common services furnished to the respective interests." To the extent this regulation is of significance in view of the Supreme Court's interpretation of section 1354, the regulation does permit assessments based on interests owned. Here plaintiff has a greater interest than others in the common areas. Moreover, the regulation does not purport to restrict the methods of allocating assessments.

My sympathy with plaintiff's plight is tempered by the fact that when he purchased his unit, he should have considered the governing documents to determine his rights and liabilities.

\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The petition of appellant John Cebular for review by the Supreme Court was denied November 15, 2006, S147039.

---

\*See footnote, *ante*, page 106.